JAMAICA ASH & RUBBISH REMOVAL CO., INC., Jet Sanitation Service Corp., and Emedio Fazzini, Plaintiffs,

v.

Edward T. FERGUSON, individually and as Chairman and Executive Director of the New York City Trade Waste Commission; Edward J. Koriansky, individually and as a member of the New York City Trade Waste Commission; Deborah Weeks, individually and as a member of the New York City Trade Waste Commission; Jules Polonetsky, individually and as a member of the New York City Trade Waste Commission; John Doherty, individually and as a member of the New York City Trade Waste Commission; The City of New York Trade Waste Commission; The City of New York; NSH Network, Inc. d/b/a Resource Management Council Service; and Resource Management Council, Inc., Defendants.

No. 98–CV–6227(JS)(MLO).

United States District Court, E.D. New York.

Feb. 29, 2000.

Stephen P. Scaring, Garden City, NY, Laurel R. Kretzing, White & Kretzing, P.C., Westbury, NY, for plaintiffs.

Robin Binder, Corporation Counsel of the City of New York, New York City, for City defendants.

Leslie R. Bennett, McMillan, Rather, Bennett & Rigano, P.C., Melville, NY, for defendants.

## MEMORANDUM & ORDER

SEYBERT, District Judge.

Plaintiffs Jamaica Ash & Rubbish Removal Co., Inc., Jet Sanitation Services Corp., and Emedio Fazzini ("Fazzini" or "Plaintiffs"), bring this § 1983 action against defendants the New York City Trade Waste Commission ("TWC"); the Chairman, Executive Director, and other members of the TWC; and the City of New York ("TWC" or "City Defendants"). Plaintiffs allege that the TWC has violated the Constitution by issuing a waste carting license to defendant Resource Management Council Service ("Resource"),[1] a license that was conditioned on Resource's cessation of its business association with the Plaintiffs. Plaintiffs claim that, through the promulgation of this condition in its license to Resource, the City Defendants have violated the Contracts Clause; the Bill of Attainder Clause; the Due Process Clause; and the Commerce Clause.

On October 13, 1998, Plaintiffs moved by Order to Show Cause for a Temporary Restraining Order and for a preliminary injunction in order to prevent the TWC from enforcing or acting upon the restriction set forth in paragraph eight of the Licensing Order that TWC issued to Resource. Following oral argument on October 14, 1998, the parties stipulated to the entry of a TRO pending a determination on the application for a preliminary injunction. This stipulation also was made so that the City Defendants could prepare a cross-motion for summary judgment, in order that both motions could be heard and decided simultaneously. The motions

were fully submitted to the Court on March 31, 1999. Oral argument was held on September 10, 1999.

The City Defendants assert that they should be granted summary judgment on all of Plaintiffs' claims because the Contracts Clause and Bill of Attainder Clause are not applicable to the TWC as an administrative agency. Defendants also argue that Plaintiffs' Due Process Clause claim should fail because Local Law 42 is not vague as applied to Plaintiffs, and because Plaintiffs do not have a recognized liberty interest to protect. Finally, Defendants claim they are entitled to summary judgment because there is no merit to Plaintiffs' Commerce Clause claim.

This Memorandum and Order constitutes the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a). For the reasons set forth below, the Plaintiffs' application for a preliminary injunction is denied and the City Defendants' cross-motion for summary judgment is granted.

## BACKGROUND

The TWC was established by Local Law 42 of 1996, codified as Title 16–A of the New York City Administrative Code ("Admin.Code"), as an attempt to release the hold that the Mafia has had on the metropolitan New York City carting industry for over forty years.[2] Defendants' Memorandum of Law in Support of Cross–Motion for Summary Judgment, ("Def.Mem."), at 2. Under this law, trade waste businesses are required to obtain a license from the TWC in order to participate in the New York City trade waste removal business. *Id.*, at 3; Admin.Code § 16–505. The TWC will grant a license only after it conducts a thorough background investiga-

1. Resource is a named defendant and has answered the complaint. However, Resource is not a party to the present motions, and has taken no position on their resolution.

2. Some of the history relevant to the enactment of Local Law 42 is detailed in *Universal*

*Sanitation Corp. v. Trade Waste Comm'n*, 940 F.Supp. 656, 659–61 (S.D.N.Y.1996) and *Sanitation and Recycling Indus. v. City of New York* ("*SRI*"), 107 F.3d 985, 989–92 (2d Cir. 1997).

tion of the applicant to make sure that all who receive licenses are of "good character, honesty and integrity." *Id.;* Admin.Code § 16–509(a). One of the factors that the TWC looks for in its investigation is whether the applicant has any "association with any member or associate of an organized crime group as identified by a federal, state or city law enforcement or investigative agency."[3] Admin.Code § 16–509(a)(vi).

Pursuant to Local Law 42, the TWC is authorized to promulgate rules and regulations necessary to effectuate the law. Admin.Code § 16–504(i). As part of these regulations, the TWC's rules provide that after an applicant has been granted a license, the licensee's principals and employees "shall not ... associate with a person whom such person knows or should know is a member or associate of an organized crime group." N.Y.C.R.R. § 1–09. The regulation further provides that "a person who has been identified by a federal, state, or local law enforcement agency as a member or associate of an organized crime group shall be presumed to be a member or associate of an organized crime group." *Id.*

On March 27, 1997, defendant Resource applied to the TWC for a license to operate a trade waste collection, removal or disposal business in New York City. City Defendants' Local Civil Rule 56.1 Statement ("Def. 56.1 Stmt."), ¶ 1. Pursuant to the power granted by Local Law 42, the TWC conducted a background investigation of Resource, and determined that Resource had recent business dealings with defendants Jamaica Ash and Jet Sanitation. *Id.,* ¶ 3. Plaintiff Fazzini is the president of both Jamaica Ash and Jet Sanitation. *Id.,* ¶ 4.

As part of the TWC's investigation, nine Resource employees were deposed. Declaration of Edward T. Ferguson

("Ferguson Decl."), ¶ 12. As part of these interviews, the employees were provided, before the depositions, with a disclosure questionnaire. *Id.,* ¶ 10. The deponents also were provided with checklists of hundreds of names of individuals and entities connected to the waste removal industry and/or to organized crime. *Id.* The deponents were asked to mark on the checklists the names they knew, the persons and entities with whom they had had prior contact, and those individuals whom they considered to be associated with organized crime. *Id.* The checklists and questionnaires were then used to focus the inquiries at the depositions and to streamline the investigation. *Id.,* ¶¶ 10, 12.

Following its investigation into Resource, the TWC issued a Licensing Order which permitted Resource to operate a trade waste collection, removal or disposal business in New York City, subject to certain conditions. Def. 56.1 Stmt., ¶ 5. The Licensing Order was signed by defendant Ferguson as Chair of the Trade Waste Commission on July 13, 1998. *Id.* The Licensing Order was counter-signed by a representative of defendant Resource on July 20, 1998. *Id.*

One of the conditions of the Licensing Order, found in paragraph eight, was that Resource not knowingly employ or otherwise retain the services of, or do business with, Plaintiffs Jamaica Ash, Jet Sanitation, or Emedio Fazzini. *Id., see also* Exhibit A., at 4–5. Paragraph eight also prohibits Resource from doing any business with any person or entity that the TWC has determined lacks good character, honesty or integrity. *Id.* In addition to the prohibition against doing business with Plaintiffs, Resource also was prohibited from conducting business with approximately fifty other named persons and entities. *Id.* The Licensing Order does not set

---

3. Because of First Amendment concerns, the Local Law's limitations in §§ 16–509(a)(v) and (vi) were given a narrowing construction by the Second Circuit, which limited the restrictions to "associational conduct occurring in connection with the waste disposal business." *SRI,* 107 F.3d at 998.

forth the reasons for the conditions contained in paragraph eight. *Id.;* Plaintiffs' Local Civil Rule 56.1 Statement ("Pl. 56.1 Stmt."), ¶ 8. Although disputed by the Plaintiffs, the City Defendants maintain that they have not disclosed the basis for the conditions in paragraph eight to any representative of Resource. Def. 56.1 Stmt., ¶ 9; *but see* Pl. 56.1 Stmt., ¶ 9.

In defense of this lawsuit, the City Defendants claim that Plaintiffs' names were placed among the Licensing Order's paragraph eight prohibitions because Fazzini "is well known to law enforcement as having close ties to organized crime." Def. 56.1 Stmt., ¶ 4; Ferguson Decl., ¶ 14. Particularly, the City Defendants submit the affidavit of Anthony Farneti, a detective investigator assigned to the New York City Police Department's Organized Crime Investigation Division. Detective Farneti has participated in various investigations involving organized crime's connections to the garbage hauling business in New York City. Affidavit of Anthony Farneti ("Farneti Aff."), ¶¶ 1–3. Detective Farneti states that he has reviewed reliable and credible information available to the New York Police Department, and states that the NYPD has concluded that plaintiff Fazzini "has knowingly associated with, and is an organized crime associate of, Salvatore Avellino, a soldier in the Lucchese Organized Crime Family." *Id.,* ¶ 6.

Detective Farneti further swears that he has been informed by the Federal Bureau of Investigation that it considers Fazzini to be a Lucchese Associate. *Id.* However, the City Defendants have not provided an affidavit from the FBI. For his part, Fazzini denies that he is now, or has ever been, a member or an associate of organized crime. Pl. 56.1 Stmt., ¶ 14; Affidavit of Emedio Fazzini ("Fazzini Aff."), ¶ 2. Plaintiffs also assert that the TWC has no evidence that Plaintiffs have knowingly associated with any member or associate of organized crime for at least the past five years. Pl. 56.1 Stmt., ¶ 17.

In support of their claim that Fazzini and his businesses are associated with organized crime, the City Defendants point out that Fazzini and Jamaica Ash had been indicted in 1984 for activities related to mob corruption of the Long Island carting industry. Ferguson Decl., ¶ 17. The 1984 indictment against Fazzini was dismissed because he inadvertently had been immunized by appearing before a Nassau County grand jury. *Id.* Fazzini and Jamaica paid $236,000 to settle related State civil bid-rigging charges. *Id.* Moreover, in 1989, Fazzini and Jamaica Ash were charged by the United States with RICO and related criminal violations in a civil racketeering complaint. *Id.* To resolve this civil racketeering complaint, Fazzini and Jamaica Ash agreed to injunctive relief, including imposition of a federal monitor over their carting industry activities.[4] *Id.* None of this information is contained in the Licensing Order.

The TWC claims that, in accordance with its usual practice, it has treated Resource's Licensing Order as confidential, and has not disclosed its contents to anyone other than representatives of Resource. Def. 56.1 Stmt., ¶ 7. Plaintiffs dispute this contention. Pl. 56.1 Stmt., ¶ 7.

Plaintiffs have never done any business in New York City. Fazzini Aff., ¶ 5. No part of the plaintiffs' service to defendant Resource takes place in New York City. Affidavit of Patricia DiMatteo ("DiMatteo Aff."), ¶ 3. Moreover, Plaintiffs have never made an application to the TWC to carry on a waste collection, removal or disposal operation in New York City. Affidavit of Stephen P. Scaring, October 12, 1998, ¶ 1; *see also* Complaint, ¶ 34. However, a portion of the waste generated by Plaintiffs' customers is ultimately disposed of outside of New York State. DiMatteo Aff., ¶ 3.

---

**4.** Plaintiffs stated at oral argument that the federal monitorship ended in June 1999 with no findings of any violations, and that the government did not seek an extension of its oversight of Plaintiffs' business operations. *See also* Ferguson Decl., ¶ 17.

## LEGAL STANDARDS

### I. STANDARD FOR ISSUANCE OF A PRELIMINARY INJUNCTION

■ The issuance of a preliminary injunction in the Second Circuit is dependent upon the movant's demonstration of (1) irreparable harm *and* (2) *either* a likelihood of success on the merits, *or* a sufficiently serious question as to the merits of the case to make them a fair ground for litigation *and* a balance of hardships tipping decidedly in its favor. *Tom Doherty Assoc., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 33 (2d Cir.1995). Such relief is extraordinary and should not be granted indiscriminately. *Patton v. Dole*, 806 F.2d 24, 28 (2d Cir.1986). "Irreparable harm" means injury that is actual and imminent. *Tom Doherty Assoc.*, 60 F.3d at 37. If a monetary award will provide adequate compensation for the injury suffered, a preliminary injunction should not issue. *Id.* at 37–38.

### II. STANDARD FOR SUMMARY JUDGMENT

"Summary judgment is appropriate where there are no genuine disputes concerning any material facts, and where the moving party is entitled to judgment as a matter of law." *In re Blackwood Assoc., L.P.*, 153 F.3d 61, 67 (2d Cir.1998) (citing Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). In deciding a summary judgment motion, the district court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the opposing party. *Castle Rock Entertainment, Inc. v. Carol Publ'g Group, Inc.*, 150 F.3d 132, 137 (2d Cir.1998) (citing *Garza v. Marine Transp. Lines, Inc.*, 861 F.2d 23, 26 (2d Cir.1988)). If there is evidence in the record as to any material fact from which an inference could be drawn in favor of the nonmovant, summary judgment is unavailable. *See Holt v. KMI–Continental, Inc.*, 95 F.3d 123, 128 (2d Cir.1996). The trial court's responsibility is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *B.F. Goodrich v. Betkoski*, 99 F.3d 505, 522 (2d Cir.1996) (quoting *Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1224 (2d Cir.1994)).

When there is nothing more than a "metaphysical doubt as to the material facts," summary judgment is proper. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, there must exist "specific facts showing that there is a genuine issue for trial" in order to deny summary judgment as to a particular claim. *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. It is against this backdrop that the Court considers the instant motion.

## DISCUSSION

### I. IRREPARABLE HARM

■ Irreparable harm is the kind of harm for which monetary damages will not provide adequate compensation. *See Tom Doherty Assoc.*, 60 F.3d at 33. In addition, the moving party must show that the harm is imminent, not remote or speculative. *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir.1990).

■ While it is clear that any harm resulting from *Resource's* termination of contractual relations with Plaintiffs is imminent—if the restrictions in paragraph eight of the Licensing Order are enforced—any such loss easily can be remedied by money damages from Resource. Plaintiffs' remedy would lie in a simple breach of contract action against Resource, assuming the contract is not terminable at will. Thus, Plaintiffs cannot establish irreparable harm based solely on its potential loss of revenue from the termination of its contract with Resource.

However, Plaintiffs argue that if the restrictions in paragraph eight are enforced, the harm which will befall them reaches far beyond the contracts with Resource. Plaintiffs' Memorandum of Law in Support of Motion for Preliminary Injunction ("Pl. Mem."), at 7. Plaintiffs argue that because TWC has prohibited Resource from doing business with them, other license holders soon also will avoid doing business with Fazzini and his companies. *Id.* Plaintiffs assert that the Defendants' actions will cause Fazzini, Jamaica Ash and Jet Sanitation to lose reputation and goodwill in the business community, which they have cultivated during fifty years of service in the solid waste industry. *Id.*

This damage to reputation and goodwill has been recognized by the Second Circuit as constituting irreparable harm. *Reuters,* 903 F.2d at 907–08; *Jacobson & Co. v. Armstrong Cork Co.,* 548 F.2d 438, 444–45 (2d Cir.1977). However, both of these cases are easily distinguishable and do not support a finding of irreparable harm in the present context.

In *Jacobson,* the plaintiff was a contractor specializing in furnishing and installing acoustical ceiling systems. *Jacobson,* 548 F.2d at 440. The defendant was the largest manufacturer of acoustical ceiling products and, pursuant to a distribution agreement between the parties, a major supplier of plaintiff's construction materials. *Id.* For reasons not relevant here, defendant notified plaintiff that its distributorship was to be terminated, following which plaintiff sought a preliminary mandatory injunction. *Id.* The district court granted this relief, and entered an order requiring defendant to continue to sell its products to plaintiff. *Id.* Defendant appealed.

The Second Circuit affirmed. The court pointed out that if plaintiff were to lose the ability to distribute defendant's line of products, plaintiff's goodwill and its customer base would be threatened. *Id.* at 444–45. The court noted that plaintiff would be placed in a competitive disadvantage, and that the "threatened loss of good will and customers, both present and potential, ... could [not] be rectified by monetary damages." *Id.* at 445.

The *Reuters* case presented practically the same set of facts as in *Jacobson:* the defendant, a supplier of unique goods, threatened to cut off the plaintiff's supply, a situation that would result in a huge loss of business and goodwill to the plaintiff. Specifically, United Press International and Reuters had entered into an agreement to provide each other with news pictures for transmission to their subscriber newspapers. *Reuters,* 903 F.2d at 905. UPI was to provide Reuters with news pictures from the United States for distribution by Reuters to Reuters' foreign subscribers, while Reuters was to provide UPI with foreign photographs for UPI to distribute to UPI's domestic subscribers. *Id.* Following a dispute between the parties, Reuters informed the less-financially-stable UPI that it would cease to provide UPI with foreign news photographs and was terminating the agreement. *Id.* at 906. UPI sought a preliminary injunction, but its application was denied based on the district court's finding that UPI would suffer no irreparable injury in the absence of an injunction. *Id.* at 906. UPI appealed.

The Second Circuit reversed, and ordered that the preliminary injunction be issued. *Id.* at 907. The court pointed out that "terminating the delivery of a unique product to a distributor whose customers expect and rely on the distributor for a continuous supply of that product almost inevitably creates irreparable damage to the good will of the distributor." *Reuters,* 903 F.2d at 907–08. This damage was particularly evident where UPI's subscribers had threatened to stop dealing with UPI if it could not continue to provide the product supplied by Reuters. *Id.* at 908. In so finding, the court found that UPI's goodwill and reputation would be injured by its sudden inability to provide foreign news photographs, and that such harm was "nearly impossible to value." *Id.*

■ The facts of the present case, however, do not align very neatly with the facts presented in *Jacobson* and *Reuters*. Here, Plaintiffs' argument is that *if* Resource's Licensing Order is enforced, and *if* word gets out that the TWC has issued a finding that Plaintiffs lack honesty and integrity, and *if* there is further consolidation of the carting industry, and *if* Plaintiffs happen to have contracts with garbage haulers who also do business or seek to do business in New York City, and *if* the TWC issues a similar finding regarding Plaintiffs' lack of honesty and integrity for each future applicant, the Plaintiffs will suffer harm essentially by being squeezed out of the carting industry. *See* Pl.Mem., at 7–8. The harm claimed by Plaintiffs is very tenuous, and is grounded only on speculation and assumption. The claimed injury is far from actual and imminent.

Moreover, a finding of irreparable harm to reputation and goodwill inherently is dependent upon whether and how far the allegedly detrimental information is spread. In this regard, there is no evidence before the Court indicating that parties outside this litigation have knowledge of paragraph eight of Resource's Licensing Order. In any event, the Licensing Order itself does not mention why Plaintiffs are listed, along with approximately fifty other persons and entities, in paragraph eight. It follows that if the Licensing Order is confidential, and does not itself explicitly link Plaintiffs to organized crime, then there is no harm to Plaintiffs' reputation or goodwill. This conclusion is correct because the only parties privy to the order are TWC and Resource, and because any third party who happened to read paragraph eight would have no idea of the basis of paragraph eight's restrictions. Any harm to reputation or goodwill cannot be imminent, because if the license is confidential, Plaintiffs only could have suffered the loss of esteem in the eyes of TWC and Resource, and this harm, if any, already has occurred.

Plaintiffs dispute the City Defendants' argument that the Licensing Order is confidential and has not been disclosed to anyone except representatives of Resource. *Compare* Def. 56.1 Stmt., ¶ 7 *with* Pl. 56.1 Stmt., ¶ 7. However, the only "evidence" offered by Plaintiffs in support of this argument is found in the February 18, 1999 affidavit of Stephen P. Scaring, Plaintiffs' attorney. Scaring argues that based on the appearance of Plaintiffs' names on the checklists employed by TWC in their investigations, together with their appearance in paragraph eight of the Licensing Order, the only conclusion to be drawn is that Plaintiffs lack good character, honesty and integrity. Affidavit of Stephen P. Scaring, February 18, 1999, ¶ 16.

■ This argument fails for two reasons. Most obviously, it fails because an attorney's statement or argument is not evidence. *Raucci v. Town of Rotterdam*, 902 F.2d 1050, 1059 (2d Cir.1990). The more significant reason that the argument fails is because it does not question that Resource's Licensing Order, which is the *only* document in dispute here, has remained confidential. Plaintiffs have not produced any evidence that the City Defendants have disclosed the contents of the Resource Licensing Order to anyone other than Resource itself. Rather, Plaintiffs instead seek to link distinct parts of the TWC's licensing process, parts that clearly are spatially and temporally unrelated. Thus, the Plaintiffs' only claim of irreparable harm is remote, speculative, and by no means imminent.

In sum, the situation presented here is entirely unlike those presented in *Jacobson* and *Reuters*. Plaintiffs are not distributors of a unique product, nor do they have any relationship at all with the City Defendants. Unlike the cases cited, there is no imminent threat to Plaintiffs' customer base. In fact, Plaintiffs' customers have no reason to fear that Plaintiffs will not be able to continue providing carting services to them, even if the Licensing Order is enforced. The claim that Plaintiffs will

lose contracts (other than the contract with Resource) if the Licensing Order is allowed to stand is wholly speculative, and any harm suffered by the loss of contract with Resource can be remedied by money damages. Moreover, Plaintiffs have failed to identify any other present contracts that will imminently be subject to impairment or cancellation in the absence of an injunction. Thus, in the absence of any imminent, irreparable injury, the preliminary injunction cannot issue.

## II. *LIKELIHOOD OF SUCCESS ON THE MERITS*

In order to secure a preliminary injunction, Plaintiffs also must show that they are likely to succeed on the merits of this case. *See Tom Doherty Assoc., Inc.*, 60 F.3d at 33. Plaintiffs have brought four claims against TWC: (1) the condition in the Licensing Order is an unconstitutional impairment of a contract; (2) the Licensing Order is an unlawful bill of attainder; (3) the Licensing Order denies Plaintiffs of their right to due process; and (4) the TWC's application of Local Law 42 violates the Commerce Clause. For the reasons discussed in Sections III through VI, *infra*, the Court determines that Plaintiffs are not likely to succeed on the merits of their claims. Therefore, the application for a preliminary injunction is denied.

## III. *CONTRACTS CLAUSE CLAIM*

▮ Article I § 10 of the Constitution states that "[n]o State shall ... pass any ... Law impairing the Obligation of Contracts." The Contracts Clause "is aimed at the legislative power of the state, and not at the decisions of its courts, or the acts of administrative or executive boards or officers." *New Orleans Waterworks Co. v. Louisiana Sugar–Refining Co.*, 125 U.S. 18, 30, 8 S.Ct. 741, 31 L.Ed. 607 (1888); *see also Barrows v. Jackson*, 346 U.S. 249, 260, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953) (Contracts Clause "is directed against legislative action only."); *Russell Pipe and Foundry Co. v. City of New York*, No. 94

CIV. 8462, 1997 WL 80601, at *12 (S.D.N.Y. Feb. 25, 1997) ("[t]he Contracts Clause applies only to legislation that impairs an individual's ability to contract, not to administrative or individual official acts.").

▮ Legislation is defined as the "act of giving or enacting laws; the power to make laws; the act of legislating; preparation and enactment of laws." Black's Law Dictionary 899 (6th Ed.1990). The term also is defined as "the exercise of the power and function of making rules (as laws) that have the force of authority by virtue of their promulgation by an official organ of a state or other organization." Webster's Ninth New Collegiate Dictionary 683 (1988). Here, the TWC's conditional grant of a license to Resource did not involve either lawmaking or rulemaking and therefore was not a legislative action. Rather, the grant of the license was a purely ministerial task, carried out by members of the executive branch of New York City government.

The only fact that Plaintiffs point to in support of the claim that the TWC is a legislative body is that the Commission acts by a majority vote with regard to the determination to grant or deny an applicant a license. *See* Pl.Opp.Mem., at 4–5. However, Plaintiffs do not challenge the TWC's decision to issue the license to Resource, but rather take issue with one of the provisions of that license. The issuance of the Licensing Order, signed by defendant Ferguson, was nothing more than an administrative act, carried out by a commission authorized and created by New York City law. The issuance of the Licensing Order bears none of the hallmarks of a legislative act; it was an application of the law, not the creation of a law.

▮ Plaintiffs' argument that the Contracts Clause applies to the TWC because the TWC exercises delegated legislative authority is without merit. The clause simply is not that expansive. If it were, a vast amount of executive and judicial ac-

tions could potentially violate the clause, because both of these branches of government operate, to varying degrees, pursuant to authority delegated by the legislature. There is nothing in this record that supports a finding that the TWC is anything but an administrative agency.

▮ In any event, Plaintiffs have not shown that the TWC's issuance of the Licensing Order impairs any contract between Plaintiffs and Resource. Although the Licensing Order's conditions may have persuaded Resource to take action to terminate its contract with Plaintiffs, and although Resource may not have taken such action in the absence of such conditions, the Licensing Order itself does not interfere with either party's contractual obligations, nor does it repudiate or alter the terms of that contract. In the absence of such interference or impairment, Plaintiffs cannot succeed on this claim. *See Jackson Sawmill Co. v. United States*, 580 F.2d 302, 311–12 (8th Cir.1978) (holding that even where federal government aids a breach of contract by a third party, no claim exists under the Contracts Clause against the government); *see also SRI*, 107 F.3d at 993 (addressing merits of Contracts Clause claim where Local Law 42 altered terms of existing contracts by shortening their duration to a period of two years). The Court has considered and rejected Plaintiffs' remaining arguments.

Because the Contracts Clause applies only to legislative bodies, and because Plaintiffs have not shown that the City Defendants' actions impaired the contractual relations between Resource and Plaintiffs, there is no likelihood of success on the merits of Plaintiffs' Contracts Clause claim. The application for a preliminary injunction on this claim is denied. Moreover, because there are no genuine issues of material facts in dispute regarding this claim, the City Defendants' cross-motion

for summary judgment on this cause of action is granted.[5]

## IV. *BILL OF ATTAINDER CLAIM*

▮ Article I § 10 of the Constitution provides that "[n]o State shall ... pass any Bill of Attainder." A bill of attainder is "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." *Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 468, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977). The prohibition on bills of attainder serves "as an implementation of the separation of powers, a general safeguard against legislative exercise of the judicial function, or more simply—trial by legislature." *United States v. Brown*, 381 U.S. 437, 442, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965).

▮ Neither the Supreme Court nor the Second Circuit directly has addressed the issue of whether the Bill of Attainder Clause applies to non-legislative bodies. *See Dehainaut v. Pena*, 32 F.3d 1066, 1070–71 (7th Cir.1994). However, several decisions inside and outside this circuit indicate that the constitutional prohibition on bills of attainder was not intended to apply to acts by an administrative body, and the Court concurs with those decisions. *See Brown*, 381 U.S. at 445, 85 S.Ct. 1707 (describing the Bill of Attainder Clause as a reflection of "the Framers' belief that the Legislative Branch is not so well suited as politically independent judges and juries to the task of ruling upon the blameworthiness of, and levying appropriate punishment upon, specific persons."); *Rein v. Socialist People's Libyan Arab Jamahiriya*, 162 F.3d 748, 761 (2d Cir.1998) (quoting with approval language that bill of attainder "legislatively determines guilt"); *Walmer v. U.S. Dep't of Defense*, 52 F.3d 851 (10th Cir.1995) (af-

---

5. Having reached the conclusion that the issuance of Resource's Licensing Order was not a legislative function, the Court declines to address the three-part test set forth in *SRI* to determine whether or not the TWC's powers are limited by the Contracts Clause. *SRI*, 107 F.3d at 993.

firming district court's ruling that Bill of Attainder Clause applied only to legislative acts, not regulatory acts); *Linnas v. I.N.S.*, 790 F.2d 1024, 1029 (2d Cir.1986) (inquiring whether the acts complained of constituted a punishment only after deciding that it was "readily apparent that the challenged provisions are a legislative act"); *Korte v. Office of Personnel Management*, 797 F.2d 967, 972 (Fed.Cir.1986) (holding that Bill of Attainder Clause limits only legislative acts, and refusing to apply clause to executive acts); *but see Joint Anti–Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 144, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Black, J. concurring) ("I cannot believe that the authors of the Constitution, who outlawed the bill of attainder, inadvertently endowed the executive with power to engage in the same tyrannical practices that had made the bill such an odious institution.").

Pursuant to the authority on this point, and because the Trade Waste Commission is involved only in administrative functions, the Plaintiffs are not likely to succeed on the merits of the Bill of Attainder claim, and a preliminary injunction cannot be issued on this ground. For similar reasons, there are no genuine issues of material fact remaining on this claim. Thus, the City Defendants' cross-motion for summary judgment on this claim is granted.

## V. DUE PROCESS CLAIMS

Plaintiffs, rather inartfully, attempt to bring two separate due process claims. First, Plaintiffs claim that "as written and as applied Local Law 42 and the Commission regulations promulgated thereunder, are unconstitutionally vague and overbroad." Complaint, ¶ 60. Second, Plaintiffs also appear to claim that neither Local Law 42, nor Title 17 of the Rules and Regulations of the City of New York, contain a framework through which Plaintiffs and others are provided notice and an

opportunity to be heard prior to being barred from doing business with recipients of trade waste licenses in New York City. Complaint, ¶ 58. The Court shall address each claim in turn.

## A. VAGUENESS CLAIM

Before addressing the merits of this claim, there is a substantial question whether Plaintiffs even have standing to pursue this cause of action. Plaintiffs admit that they have never done any business in New York City. Fazzini Aff., ¶ 5. They also admit that no part of their services to defendant Resource takes place in New York City. DiMatteo Aff., ¶ 3. Plaintiffs further admit that they have not made any application to the TWC. Affidavit of Stephen P. Scaring, October 12, 1998, ¶ 1; *see also* Complaint, ¶ 34. Plaintiffs' sole basis for asserting this claim is that Resource's Licensing Order prohibits Resource from doing business with Plaintiffs, purportedly on the basis that Plaintiffs are associated with organized crime. In other words, Plaintiffs attack Local Law 42 and its implementing regulations not on the basis of what the law's language means to Plaintiffs, but on the basis of what the law's language means for Resource regarding the persons with whom Resource may associate if it desires to obtain and keep a license to haul waste in New York City.[6]

There are three elements of Article III standing: injury, causation, and redressability. *Friends of the Earth, Inc. v. Laidlaw Environmental Servs. (TOC), Inc.*, —— U.S. ——, 120 S.Ct. 693, 703, 145 L.Ed.2d 610 (2000). As the Supreme Court recently held, "to satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the

---

**6.** More particularly, Plaintiffs attack the allegedly arbitrary process by which the TWC determines whether one is an "associate of organized crime" under the law and the implementing regulations. Pl.Mem. at 16–17.

defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.,* at 703 (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

There are two central problems with the issue of Plaintiffs' standing to bring a vagueness claim. First, as the Court already has held, Plaintiffs' alleged injury—harm to reputation—is entirely speculative, depending as it does on a variety of events that have not yet occurred. The alleged injury also is far from imminent. *See* Section I., *supra.* Second, the Plaintiffs' claimed injury is not fairly traceable to the challenged action of the City Defendants, that is, fairly traceable to the allegedly vague language of Local Law 42 and its accompanying regulations. *See* Complaint, ¶ 60.

 Having admitted that they do no business in New York City, that they never have done business in New York City, and that they have not made an application to do business in New York City, Plaintiffs have no standing to bring a vagueness claim challenging the language of a municipal law to which they have not subjected themselves. Plaintiffs cannot maintain a claim asserting that the law and regulations are vague when, by their own admission, they have not placed themselves under the umbrella of the law. As relevant here, Local Law 42 applies only to those persons who seek or possess a license to collect, remove or dispose of trade waste in New York City. Plaintiffs are neither applicants nor licensees. Plaintiffs cannot fairly claim that they have been injured by the law and regulations on vagueness grounds, simply because the law and regulations do not regulate or attempt to regulate the Plaintiffs nor their business activities. Therefore, the Court holds that Plaintiffs have no standing to assert a vagueness claim against the City Defendants regarding Local Law 42 and its regulations.

In the end analysis, Plaintiffs are simply trying to assert Resource's rights by bringing a claim that Local Law 42 and its regulations are unconstitutionally vague. Notably, Resource makes no claim that it feels confined in any way by the restrictions in the Licensing Order, that it disagrees with the restrictions, or that the law and regulations are not clear enough to put it on notice of the law's requirements. *See Rock of Ages Corp. v. Secretary of Labor,* 170 F.3d 148, 156 (2d Cir. 1999) (due process satisfied if reasonable person, familiar with the law's objectives, has fair warning of law's requirements).

The Plaintiffs cannot succeed on the vagueness cause of action. Summary judgment is granted to the City Defendants on this claim.

## B. ALLEGED DEPRIVATION OF LIBERTY INTEREST IN REPUTATION

Plaintiffs also claim that they were deprived of due process by the TWC's determination that Plaintiffs are associated with organized crime. *See* Pl.Opp.Mem., at 17. Specifically, Plaintiffs argue that they have suffered the stigma associated with being labeled a member of organized crime, without any statutory framework through which their names may be cleared. *See id.*

 The Due Process Clause requires "that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 313, 70 S.Ct. 652, 94 L.Ed. 865 (1950). The terms "liberty" and "property" are very fluid. They stretch far beyond traditional definitions such as chattel, currency, real estate, or freedom from imprisonment. *See Board of Regents v. Roth,* 408 U.S. 564, 571–72, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). The Supreme Court has recognized that "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an

opportunity to be heard are essential." *Wisconsin v. Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971). This damage to reputation or goodwill, however, must be coupled with a deprivation of some other material interest in order to give rise to a protected interest. *Paul v. Davis,* 424 U.S. 693, 701, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). As recently stated by the Second Circuit, "[d]ue process is implicated only when there is a 'stigma plus,' that is to say a loss of reputation coupled with some other tangible element." *Morris v. Lindau,* 196 F.3d 102, 114 (2d Cir.1999) (quotation omitted). This "stigma plus" requirement demands more than just the "deleterious effects which flow directly from a sullied reputation." *Valmonte v. Bane,* 18 F.3d 992, 1000–01 (2d Cir.1994) (holding that a plaintiff, branded a child abuser by the state, who suffered "tangible burden" on employment prospects, satisfied "stigma-plus" requirement for deprivation of a liberty interest).

■ In order to damage a person's reputation to the point that he or she has been deprived of a liberty interest, it is first necessary that the that there be a public disclosure. *See Bishop v. Wood,* 426 U.S. 341, 348, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976), *overruled in part on other grounds, Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). As stated by the Supreme Court in *Bishop,* neither a private communication, nor a subsequent communication made in the course of litigation, can properly serve as the basis for a claim of deprivation of a liberty interest. *Id.* at 348–49, 96 S.Ct. 2074; *see also Donato v. Plainview–Old Bethpage Cent. Sch. Dist.,* 96 F.3d 623, 631 (2d Cir.1996) (holding that "[s]tigmatizing statements by the government . . . only implicate a liberty interest when there is also public disclosure."). Here, Plaintiffs argue that their inclusion on the checklists that TWC provides to applicants and their employees to assist with the deposition process consti-

tutes such public disclosure. *See* Pl. Opp.Mem., at 17.

The City Defendants challenge this assertion on the ground that the Licensing Order given to Resource did not make any statement or indication that Plaintiffs were associated with, or members of, organized crime. Defendants also claim that the Licensing Order issued to Resource was not released to anyone except Resource, and claim that the Licensing Order was not made public. The City Defendants also point out that by its own terms, paragraph eight of the Licensing Order does not include the *reason* why Resource was prohibited from doing business with Plaintiffs. Therefore, the City Defendants claim that even if anyone had viewed the Licensing Order, that person would not know the basis for the paragraph's exclusionary provisions.

■ Plaintiffs have submitted no evidence demonstrating that there has been any public disclosure by the City Defendants of any statement that Plaintiffs are members or associates of organized crime. First, the Licensing Order does not make such a statement, it merely contains a list of approximately fifty enumerated entities with whom Resource may not do business. Second, although Plaintiffs dispute that the Licensing Order is confidential, they have provided no evidence to the contrary. Third, the checklists, attached as Exhibit S to the Scaring Reply Affidavit, make no mention that Fazzini, Jamaica Ash, or Jet Sanitation are affiliates of organized crime. Plaintiffs have presented no evidence that their mere appearance on these checklists constitutes public disclosure of the allegedly stigmatizing statement. Moreover, Plaintiffs' argument that these checklists constitute some sort of McCarthyesque blacklist is entirely disingenuous and wholly without merit. *See* Complaint, ¶¶ 30–31, 51, 57–58, 65. The Court has considered and rejected Plaintiffs' remaining arguments.

In the absence of any evidence that the City Defendants have publicly branded

Plaintiffs as members or associates of organized crime, Plaintiffs have not identified a protected liberty interest, and therefore are not likely to succeed on the merits of this claim. *Compare Valmonte,* 18 F.3d at 1000. Moreover, because there are no genuine issues of material fact regarding this claim, summary judgment on the due process claim is granted to the City Defendants.

## VI. *COMMERCE CLAUSE CLAIM*

The essence of Plaintiffs' Commerce Clause claim is that the Defendants, through Local Law 42, are attempting to regulate interstate commerce in violation of the constitution. Complaint, ¶¶ 42–48; *see also* Pl.Mem., at 12–13. Plaintiffs argue that the actions of TWC have an "overwhelming" burden on interstate commerce outside the City of New York, and that such burden substantially outweighs the local benefit of Local Law 42 and its regulations. Pl.Mem., at 12–13.

The City Defendants, on the other hand, argue that while there is no doubt that the Constitution limits the powers of the states to interfere with interstate commerce, these limitations are not absolute. *See Lewis v. BT Inv. Managers, Inc.,* 447 U.S. 27, 35–36, 100 S.Ct. 2009, 64 L.Ed.2d 702 (1980) (noting that "[i]n the absence of conflicting federal legislation, the States retain authority under their general police powers to regulate matters of 'legitimate local concern,' even though interstate commerce may be affected."); *see also Incorporated Village of Rockville Ctr. v. Town of Hempstead,* 196 F.3d 395, 398 (2d Cir. 1999) ("the Supreme Court has long read the [Commerce] Clause . . . to prohibit the states, in the absence of specific congressional authorization, from regulating interstate commerce."). The City Defendants argue that because there has been no federal preemption of the specific subject matter at issue here, and no conflicting

federal legislation, New York City retains its general police power to regulate matters of local concern, even if interstate commerce is burdened incidentally. *See id.* Defendants also argue that Local Law 42 and the TWC's regulations do not violate the Commerce Clause because the City's regulation of the trade waste industry is evenhanded, there is a legitimate local public interest, and any effect on interstate commerce is minimal. *See Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970) (setting forth balancing test between effects on interstate commerce and putative local benefits of the challenged statute).

The law distinguishes between state or local regulatory regimes that are protectionist in nature and those that are simple exercises of general police powers. *See Maine v. Taylor,* 477 U.S. 131, 138, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986). While the former are subject to a high level of scrutiny because they unfairly assist local businesses at the expense of non-local entities, the latter type of regulation is presumptively valid. *See id.*

One of the central problems with the Plaintiffs' position is that they challenge legislative action of New York City that arguably has a ripple effect outside of the City's boundaries. Thus, Plaintiffs challenge a local law that has had an effect intrastate, but outside the City's boundaries. The challenge is not one of interstate commerce in the traditional sense.[7] Moreover, the cases cited by Plaintiffs in support of their argument all deal with situations where a state law, rather than a municipal law, was challenged because of its extraterritorial effects on commerce. *See BMW of North America, Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996); *Healy v. Beer Institute,* 491 U.S. 324, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989); *Edgar v. MITE,* 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982).

---

**7.** Although Plaintiffs claim that a portion of the waste generated by their customers is ultimately disposed of outside New York

State, Plaintiffs have furnished no evidence or data quantifying the alleged effect on interstate commerce occasioned by such disposal.

The *BMW* case is wholly inapplicable to the present dispute. In *BMW,* the Supreme Court considered the constitutionality of a punitive damages award entered against BMW in Alabama state court. *BMW,* 517 U.S. at 562–63, 116 S.Ct. 1589. The Court conducted its analysis of the award under the Due Process Clause—not the Commerce Clause. *Id.* at 568, 116 S.Ct. 1589. The Court's very brief discussion of the national economic policy reasons embodied in the Commerce Clause (which was not even mentioned by name), was preliminary to its discussion of its Due Process analysis, and is of no utility in considering the present motions. *See id.* at 571–72, 116 S.Ct. 1589.

The *Healy* case likewise is inapposite. In *Healy,* the plaintiffs challenged a Connecticut state law that required out-of-state beer distributors to affirm that their posted prices for products sold to in-state wholesalers were no higher than the prices at which the same products were sold to wholesalers in the neighboring states of New York, Rhode Island and Massachusetts. 491 U.S. at 326, 109 S.Ct. 2491. In discussing the Commerce Clause challenge to this state law, the Court set forth three propositions that guide such analyses.

First, the Court pointed out that "the Commerce Clause precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State." *Id.* at 336, 109 S.Ct. 2491 (internal ellipses and quotation omitted). Second, the Court noted that "a statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority and is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature." *Id.* In essence, the central question is "whether the practical effect of the [law or] regulation is to control conduct beyond the boundaries of the State." *Id.*

Finally, the Court stated that in evaluating the practical effect of a statute, lower courts should consider not only the consequences of the challenged statute, but also how that statute interacts with the legitimate regulatory regimes of other sovereign States. *Id.* The court may also consider what would happen if many, or every, State enacted similar legislation. *Id.*

Looking at the present case under the *Healy* analysis, it is difficult to see, first of all, how Plaintiffs can challenge a *municipal* law or regulation that affects Plaintiffs' businesses when Plaintiffs do business only in Nassau and Suffolk counties. There is absolutely no evidence that the alleged interstate aspect of Plaintiffs' disposal operations is impinged or burdened as a result of Local Law 42. *See* Complaint, ¶ 44. At the very most, Plaintiffs might be able to claim that because of the termination of their contract with Resource, Plaintiffs would dispose of a slightly less amount of garbage outside New York State than would be disposed of by them were the contract with Resource to remain in effect. However, no evidence of this impact has been presented.

In effect, the situation here is one where an intrastate plaintiff challenges an intrastate municipal law that affects the plaintiff's operations intrastate. The interstate effect is the crucial missing element. The omission of this element is especially glaring considering that the Commerce Clause, and the so-called "dormant" Commerce Clause, are interpreted to ensure that the nation as a whole maintains a "national economic union unfettered by state-imposed limitations on interstate commerce." *Healy,* 491 U.S. at 335–36, 109 S.Ct. 2491. There is no state law challenged here, and there is little, if any, effect on interstate commerce on the present record.

The second part of the *Healy* analysis fares no better than the first. The challenged law and regulations do not "directly control" commerce outside of New York State, nor outside of New York City, assuming for the sake of argument that a

challenge exists on the basis of the municipal law. Nor does the practical effect of the statute and regulations serve to control conduct outside New York State or New York City. This conclusion is further validated when Resource's independent decision to accept the City's contractual conditions is injected into the analysis. Resource simply made a business decision that it was more lucrative for it to enter the New York City market than to maintain its relationship with Plaintiffs in Nassau and Suffolk counties. Far from controlling Resource's conduct outside of New York City, Resource chose to reject the contract with Plaintiffs in exchange for entry into the apparently lucrative New York City trade waste market. It is apparent that had Resource simply rejected the conditions in paragraph eight of the Licensing Order, there would be no dispute.

■ As far at the third part of the *Healy* analysis, the Court is hard pressed to see how the challenged actions would interact with the laws and regulations of other States or municipalities in a way that would offend the Commerce Clause. "[T]he Commerce Clause protects against inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State." *Healy*, 491 U.S. at 336–37, 109 S.Ct. 2491. Nothing similar to this prohibition has occurred here. Plaintiffs cannot be granted relief under the *Healy* case.

Finally, *Edgar v. MITE Corp.*, a plurality decision of the Supreme Court, does not change the result. In *MITE*, an Illinois state securities law was challenged as violative of the Commerce Clause. *MITE*, 457 U.S. at 626–27, 102 S.Ct. 2629. The Court succinctly divided its Commerce Clause analysis into two prongs. First, the Court pointed out that "[a] state statute must be upheld if it 'regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental unless the burden imposed on such commerce is

clearly excessive in relation to the putative local benefits.' " *Id.* at 640, 102 S.Ct. 2629 (quoting *Pike*, 397 U.S. at 142, 90 S.Ct. 844) (internal ellipses omitted). Second, the Court noted that the Commerce Clause "permits only *incidental* regulation of interstate commerce by the States; direct regulation is prohibited." *Id.* (citation omitted) (emphasis in original).

■ Under either prong of this analysis, Plaintiffs cannot succeed. First, there is no doubt that Local Law 42 is administered evenhandedly. Plaintiffs have presented no evidence to the contrary. Second, the goal of the law and regulations is undoubtedly a legitimate public concern. *See SRI*, 107 F.3d at 994 ("the law has a legitimate purpose ... [of] eradicating the vestiges of criminal control" of the carting industry). Third, the effect of the law on interstate commerce, if any, is negligible to the point of being meaningless. Moreover, assuming that a burden on commerce existed, the burden is not "clearly excessive" in relation to the impressive local benefits of the law. *See id.* at 989, 994.

Plaintiffs also fail under the second prong of the *MITE* analysis. There is no legitimate argument that the challenged law or regulations "directly regulate" interstate commerce. Instead, the law regulates a specific industry within New York City, and does so by insulating that industry from the effects and influence of organized crime. There is no violation of the Commerce Clause here, and Plaintiffs' reliance on *MITE* is misplaced.

Because the Plaintiffs are not likely to succeed on the merits of the Commerce Clause claim, injunctive relief is not available. Moreover, because there are no genuine issues of material fact on the present record regarding this claim, the City Defendants' motion for summary judgment is granted.

### CONCLUSION

For the reasons stated above, the plaintiffs' application for a preliminary injunc-

tion is DENIED. The City defendants' motion for summary judgment is GRANTED, and all claims against the City Defendants are DISMISSED with prejudice.

The parties are directed to contact Magistrate Judge Orenstein within ten days of receipt of this Memorandum and Order to schedule a status conference regarding the remaining claims in this matter.

SO ORDERED.